No.  _____

———————————————————————————

**In the United States Court of Appeals for the Fifth Circuit**

———————————————————————————

In re: Edward Lee Busby,

*Movant*

———————————————————————————

**MOTION FOR ORDER AUTHORIZING
CONSIDERATION OF SECOND PETITION FOR
WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2244**

———————————————————————————

**This is a death penalty case.
Mr. Busby is scheduled to be executed on Thursday, May 14, 2026.**

| | |
|---|---|
| David R. Dow | Jeffrey R. Newberry |
| Texas Bar No. 06064900 | Texas Bar No. 24060966 |
| University of Houston Law Center | University of Houston Law Center |
| 4170 Martin Luther King Blvd. | 4170 Martin Luther King Blvd. |
| Houston, Texas 77204-6060 | Houston, Texas 77204-6060 |
| Tel. (713) 743-2171 | Tel. (713) 743-6843 |
| Fax (832) 842-4671 | Fax (832) 842-4671 |
| Email ddow@central.uh.edu | Email jrnewber@central.uh.edu |

*Counsel to Edward Lee Busby, Movant*

**Table of Contents**

Index of Authorities ...................................................................................iii

MOTION FOR ORDER AUTHORIZING CONSIDERATION OF
SECOND PETITION FOR WRIT OF HABEAS CORPUS UNDER
28 U.S.C. § 2244 .......................................................................................1

I.      Introduction..................................................................................1

II.     Jurisdiction ..................................................................................3

III.    Factual and procedural background ...........................................3

IV.     Busby's claim satisfies the prima facie showing required by 28
        U.S.C. § 2244(b)(3)(C). ..............................................................9

        A.      The Court should find Busby's current *Atkins* claim is
                fundamentally different from his former claim and, for
                that reason, should not be dismissed pursuant to §
                2244(b)(1).................................................................................9

        B.      Busby is intellectually disabled. ...................................11

                1.      Busby possess significantly subaverage intellectual
                        functioning. ......................................................11

                        a.      WAIS-IV (2010 and 2022) ................................. 12

                        b.      Unknown test (2001)......................................... 14

                        c.      WAIS-III (2005)..................................................... 14

                        d.      Beta-III (2005)...................................................... 15

                        e.      WAIS-III (2005)..................................................... 16

2.    Evidence of significant limits in adaptive behavior. ........ 17

C.    Busby's claim was not available until he received the funds necessary to obtain an expert report. ............................ 23

D.    The Court should find that Busby is entitled to equitable tolling…………..................................................................... 24

V.    Conclusion…………............................................................................ 26

Verification…………………….............................................................................. 27

Certificate of Service and Compliance with ECF Filing Standards............... 28

Certificate of Compliance with Rule 32(a) ...................................................... 29

# Index of Authorities

## Cases

*Busby v. Davis*,
   589 U.S. 1141 (2020)..............................................................................8

*Busby v. Davis*,
   925 F.3d 699 (5th Cir. 2019) ........................................................ 1, 7-8

*Busby v. Davis*,
   677 F. App'x 884 (5th Cir. 2017) .........................................................7

*Ex parte Busby*,
   No. WR-70,747-02, 2013 WL 831550 (Tex. Crim. App. Mar. 6,
   2013)…...................................................................................................7

*Ex parte Busby*,
   No. WR-70,747-01, 2009 WL 483096 (Tex. Crim. App. Feb.
   25, 2009)............................................................................................3-4

*Ex parte Cathey*,
   451 S.W.3d 1 (Tex. Crim. App. 2014)................................................ 12

*Ibarra v. Thaler*,
   691 F.3d 677 (5th Cir. 2012), *overruled on other grounds by*
   *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).......................................... 10

*In re Busby*,
   No. WR-70,747-03, 2020 WL 2029306 (Tex. Crim. App. Apr.
   27, 2020).................................................................................................8

*In re Tex. Dep't Crim. Just.*,
   710 S.W.3d 731 (Tex. Crim. App. 2025).............................................. 6

**Rules**

28 U.S.C. § 2244 ................................................................................*passim*

Tex. Code Crim. Proc. art. 11.071 ................................................. 6

No. _____

_____

**In the United States Court of Appeals for the Fifth Circuit**

_____

In re: Edward Lee Busby,

*Movant*

_____

**MOTION FOR ORDER AUTHORIZING
CONSIDERATION OF SECOND PETITION FOR
WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2244**

_____

## I.    Introduction

Every clinician who has opined during post-conviction proceedings on

whether Movant Edward Lee Busby meets the criteria for intellectual

disability has determined that he satisfies those criteria. Almost seven years

ago, this Court wrote that the state court decision to deny Busby relief on his

*Atkins* claim was not an unreasonable determination of the facts, in part

because Busby had failed to produce a report from any expert opining that he

is intellectually disabled. *Busby v. Davis*, 925 F.3d 699, 720 (5th Cir. 2019).[1]

_____

[1] "If Busby was in fact evaluated by an expert in intellectual disability, . . . Busby has not disclosed the results of such an evaluation. . . . We do not know therefore, what conclusions, if any, Martinez may have drawn in that report as to whether Busby is intellectually disabled." *Busby v. Davis*, 925 F.3d 699, 720 (5th Cir. 2019).

1

This Court's 2019 opinion makes clear that an expert report opining that a death-sentenced inmate is intellectually disabled is a necessary component of an *Atkins* claim. Put differently, an *Atkins* claim is not available until the inmate receives whatever funds he needs to obtain such a report.

As this Court is well-aware, the reason the record seven years ago was devoid of any expert report opining that Busby is intellectually disabled is because the federal district court denied Busby the funds necessary to obtain such a report. Not until June 2021 -- during an ongoing state habeas proceeding -- did Busby obtain the funds necessary to obtain an expert report. The expert report opining that he is intellectually disabled constitutes the factual predicate for Busby's claim, and it was not available until the state court, at last, authorized the necessary funds.

While Busby attempted to raise an *Atkins* claim in his previous federal habeas proceeding, this Court should nonetheless find that claim that he attempts to raise now is not the same because his current claim contains the necessary component he was previously denied: an expert report. Busby respectfully moves, pursuant to 28 U.S.C. § 2244(b)(3)(C), for an order authorizing the filing and consideration of a second petition for writ of

habeas corpus, a copy of which is attached as an appendix to this motion, and for an order staying his execution, currently scheduled for May 14, 2026.

## II.    Jurisdiction

This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 2244(b). Busby is under a judgment and sentence of death entered in the Criminal District Court Number Two of Tarrant County, Texas. Busby seeks leave to challenge his sentence in the underlying successive petition for writ of habeas corpus.

## III.    Factual and procedural background

Busby was convicted in November 2005 of a capital murder committed in January 2004. ROA.5396.[2] He was sentenced to death by the trial court in 2005. ROA.5406. The Texas Court of Criminal Appeals ("CCA") affirmed his conviction and sentence on direct appeal in 2008. ROA.5422. Busby then filed an application post-conviction writ of habeas corpus in the state habeas court, and the Court of Criminal Appeals denied him relief in February 2009. *Ex parte Busby*, No. WR-70,747-01, 2009 WL

---

[2] To facilitate this Court's review, Counsel has cited the record in the district court according to the record on appeal in this Court in cause number 26-70004.

483096, at *1 (Tex. Crim. App. Feb. 25, 2009).

On April 13, 2009, the district court appointed undersigned Counsel Dow to represent Busby in his initial federal habeas proceeding. ROA.23. Busby filed a Petition for Writ of Habeas Corpus in the district court on February 25, 2010, and an amended petition on May 24, 2010. ROA.81; ROA.703. Busby raised several issues in his Amended Petition, including that his death sentence violates the Eighth and Fourteenth Amendments pursuant to the Supreme Court's opinion issued in *Atkins v. Virginia*, 536 U.S. 304 (2002), because he is intellectually disabled. ROA.816-45.

Counsel employed Gilbert Martinez in 2010 at Counsel's own expense to administer an intelligence test to Busby, believing Busby likely to be intellectually disabled. ROA.1634-35. Dr. Martinez administered the WAIS-IV to Busby on Feb. 11, 2010, and found that Busby possesses a full-scale IQ score of 74. *Id.* On September 9, 2011, Busby filed a motion requesting that the district court authorize funds to obtain the reasonably necessary services from a mental disability expert, pursuant to 18 U.S.C. § 3599. ROA.1632. Busby sought the funds so that an expert, specifically, Dr. Stephen Greenspan, could determine whether Busby is intellectually

disabled, given that Dr. Martinez had found him to possess a full-scale IQ score indicative of significantly subaverage intellectual functioning. ROA.1651. The district court denied the requested funds, believing Busby could not show the funds were reasonably necessary because he could not conclusively demonstrate the claim he sought to develop was procedurally viable. ROA.1870-71. The court then opined that even if the claim Busby sought to develop was not procedurally defaulted, the requested funds were not reasonably necessary because Busby could not show he possessed significantly subaverage intellectual functioning. ROA.1876.

The district court then ordered the proceeding be stayed and held in abeyance so that Busby could attempt to exhaust his claim in the state court. ROA.1884. The same day, the district court ordered Undersigned Counsel Dow to seek funding from the state court for his legal services, writing § 3599 was not intended to supplant any state procedure for appointing and paying attorneys. ROA.1881. Both to adhere to the court's instruction to seek payment from the state court and to seek from the state court funds necessary to develop Busby's claim, which the district court had previously denied, Busby filed a motion in the state trial court that asked that court to

5

appoint Undersigned Counsel to represent him in his subsequent state habeas proceeding. Ex Parte Mot. Appointment Counsel, *Ex parte Busby*, Cause No. 0920589A (Tarrant Cnty. Crim. Ct. No. 2, Aug. 17, 2012). On September 7, 2012, the trial court denied the motion for appointment of counsel because it lacked jurisdiction to rule on the motion. Order, *Ex parte Busby*, Cause No. 0920589A (Tarrant Cnty. Crim. Ct. No. 2, Sept. 7, 2012).[3]

Pursuant to the district court's order, Busby filed a subsequent application for habeas corpus in the state habeas trial court in October 2012. ROA.3690. Because neither the district court nor the state court had granted the funds necessary to obtain a report from an expert opining that Busby is intellectually disabled, his then-*Atkins* claim was supported only by the full-scale IQ score Dr. Martinez obtained in 2010 and was identical, in all relevant respects, to the claim contained in his amended petition filed in the district court. Months later, the CCA dismissed Busby's habeas application because it found that the claim failed to satisfy the dictates of section 5,

---

[3]The trial court's decision was not unsound. Under Texas law, a trial court cannot act on a subsequent application for writ of habeas corpus until after the Texas Court of Criminal Appeals authorizes it to do so. *See also* Tex. Code Crim. Proc. art 11.071, § 5(a). A trial court is similarly without authority to rule on related motions such as a motion to appoint counsel, or to authorize funds reasonably necessary to develop meritorious claims. *See In re Tex. Dep't Crim. Just.*, 710 S.W.3d 731, 737-38 (Tex. Crim. App. 2025).

6

purporting to do so without considering the merits of Busby's *Atkins* claim. *Ex parte Busby*, No. WR-70, 747-02, 2013 WL 831550, at *1 (Tex. Crim. App. Mar. 6, 2013).

After subsequently returning to the district court, Busby filed a Second Amended Petition for a Writ of Habeas Corpus on March 27, 2014. ROA.2350. On March 10, 2015, the district court entered its order denying Busby relief. ROA.3316. As mentioned above, with respect to Busby's *Atkins* claim, the court found that the claim was procedurally defaulted because Busby could not demonstrate it would be a miscarriage of justice to execute him because the Court believed that an individual must have an IQ of 70 or below to be intellectually disabled and the Court furthered believed Busby's actual IQ score to likely be "in the 70s." ROA.3352.

On appeal, this Court granted a certificate of appealability, finding that reasonable jurists would debate both whether Busby possesses significantly subaverage intellectual functioning and whether his claim was procedurally defaulted. *Busby v. Davis*, 677 F. App'x 884, 888-89 (5th Cir. 2017). On May 20, 2019, this Court issued its opinion affirming the district court's decision denying Busby relief on his *Atkins* claim. *Busby v. Davis*, 925 F.3d 699, 702

7

(5th Cir. 2019). In its opinion, this Court noted that "no expert has ever opined that Busby is intellectually disabled." *Id.* at 706. The Supreme Court denied certiorari on January 13, 2020. *Busby v. Davis*, 589 U.S. 1141 (2020).

Busby was initially scheduled to be executed in May 2020, but that execution was stayed due to the global pandemic. *In re Busby*, No. WR-70,747-03, 2020 WL 2029306, at *1 (Tex. Crim. App. Apr. 27, 2020). After executions resumed following the pandemic-related pause, Busby was again scheduled to be executed on February 10, 2021. Ahead of that planned execution, Counsel presented Busby's *Atkins* claim to the CCA again, and the Court found that Busby's claim made a threshold showing that he is intellectually disabled pursuant to the Supreme Court's opinion issued in *Moore v. Texas*, 581 U.S. 1 (2017), and remanded the claim to the state habeas trial court for further proceedings. ROA.5527.

Following the remand, the state trial court at last granted Busby the funds necessary to obtain an opinion from an expert regarding whether Busby is intellectually disabled (funds Counsel had been seeking since 2009). Counsel utilized those funds -- secured more than twelve years after they were first requested -- to employ Dr. Gilbert Martinez. Dr. Martinez's

8

opinion, announced in his July 11, 2022, Report (ROA.3484-3509) is that Busby is intellectually disabled. The State subsequently hired an expert -- Dr. Antoinette McGarrahan -- who agreed with Dr. Martinez's conclusion. ROA.3510-15. The State and Busby both asked the trial court to find Busby is ineligible for execution. ROA.3516-37. Nevertheless, the CCA denied Busby habeas relief on March 5, 2025, and denied his Suggestion to Reconsider on April 25, 2025.

## IV.   Busby's claim satisfies the prima facie showing required by 28 U.S.C. § 2244(b)(3)(C).

Busby seeks authorization to raise a single claim in a successive federal habeas corpus petition. That claim is that he is ineligible for execution pursuant to the Eighth and Fourteenth Amendments because he is intellectually disabled.

### A.   The Court should find Busby's current *Atkins* claim is fundamentally different from his former claim and, for that reason, should not be dismissed pursuant to § 2244(b)(1).

As noted above, Counsel attempted to raise an *Atkins* claim in Busby's initial federal habeas petition. Had the district court granted Busby the funds necessary to obtain an expert report, the claim would have been available to Busby in that proceeding. Because the district court denied Busby the funds

necessary to obtain such a report, it was simply not possible to obtain relief on his claim.

Moreover, for purposes of considering whether Busby's claim was presented in a prior petition, the addition of two expert reports makes the claim fundamentally different from the claim previously presented. While in a slightly different context, there is precedent from this Court to support the idea that an expert report can render an *Atkins* claim different from previous versions of the claim. Ruben Ibarra presented an *Atkins* claim to the state habeas court which was supported by no expert report and virtually no other evidence. *Ibarra v. Thaler*, 691 F.3d 677, 681-82 (5th Cir. 2012), *overruled on other grounds by Trevino v. Thaler*, 133 S. Ct. 1911 (2013). This Court found that the *Atkins* claim that Ibarra presented to the federal district court -- supported by the expert opinion ruled inadmissible in the state court proceeding -- was unexhausted because the addition of the expert report made the claim fundamentally different from the one presented to the state court. *Id.* at 682-83.

While *Ibarra* is concerned with procedural default and whether a claim presented to a federal court is different from one presented to the state

court, its rule -- i.e., that the addition of an expert report can render an

*Atkins* claim fundamentally different from previous iterations of the claim --

is nonetheless applicable here. Because it is now supported by the expert

opinion of Dr. Gilbert Martinez (and also the expert opinion of the State's

expert, who agrees that Busby is intellectually disabled), the claim that Busby

now raises in this Court is significantly stronger and should be considered a

different claim from the one he previously presented to this Court.

**B.     Busby is intellectually disabled.**

Busby is intellectually disabled. The evidence shows that: (1) he

possesses significantly subaverage intellectual functioning; (2) he has

significant limitations in his adaptive functioning; and (3) he exhibited these

diagnostic features before the age of eighteen.

**1.     Busby possesses significantly subaverage intellectual functioning.**

When assessing an individual's level of intellectual functioning based

on an IQ score, the accepted scientific phenomenon known as the "Flynn

Effect"—in which the general population's average IQ score is observed to

perform better on intelligence tests over time—should be taken into account.

*See* 2010 AAIDD Manual at 37. Flynn's empirical research has demonstrated

that the average IQ score obtained by any given group on the Wechsler scale has historically increased by approximately 0.33 points per year. *Id.*

In *Ex parte Cathey*, 451 S.W.3d 1 (Tex. Crim. App. 2014), the CCA noted that the preferred solution to account for the Flynn Effect is to retest individuals with a recently normed version of an IQ test rather than adjusting an individual's score for the Flynn Effect. *Ex parte Cathey*, 451 S.W.3d 1, 16 (Tex. Crim. App. 2014). However, if it is not possible to retest an applicant with a recently normed test, the impact of the Flynn Effect on an individual's IQ score can be considered. *Id.* at 17. As more recently normed IQ tests are more reliable, Busby's IQ scores obtained from the WAIS-IV will be discussed first. The IQ scores Mr. Busby received from other IQ tests will be subsequently discussed in chronological order.

### a.    WAIS-IV (2010 and 2022)

As noted above, on February 11, 2010, Dr. Gilbert Martinez administered the Wechsler Adult Intelligence Scales—Fourth Edition ("WAIS-IV") to Mr. Busby. ROA.3485-86. Busby obtained a full-scale IQ score of 74. ROA.3485. Given the standard error of measurement, this means Busby's IQ was between 70 and 79. *Id.*

12

As part of the 2010 administration, Dr. Martinez administered validity testing—specifically, a standardized measure called the Test of memory malingering ("TOMM")—to determine whether Busby was performing to the best of his abilities. *Id.* The results of the validity testing were "consistent with good effort" on Busby's part, meaning there is no reason to believe Busby malingered during the cognitive testing. *Id.*

On February 25, 2022, Dr. Martinez again administered the WAIS-IV to Busby. ROA.3490. Busby obtained a full-scale IQ score of 81. *Id.* The report notes the seven-point increase was likely caused by both the Flynn Effect and the practice effect. ROA.3508-09. Because the WAIS-IV was published in 2008 (fourteen years before the 2022 administration), Dr. Martinez believes that, to account for the Flynn Effect, Busby's 2022 score should be adjusted by four points. *Id.* Accounting for this adjustment, Busby's Flynn-adjusted score is 77. *Id.*

Dr. Martinez believes the practice effect also had an impact on Busby's 2022 score. *Id.* "Practice effects refer to gains in standardized test scores that result from a person being tested a second time using the same instrument." ROA.3508; *see also* 2010 AAIDD Manual at 38. Despite a lack

13

of universal agreement on quantitative score adjustments, the practice effect has shown increases of 2.5 points in verbal IQ and up to eight points in performance IQ. ROA.3508.

Dr. Martinez believes that when both the Flynn and practice effects are taken into account, Busby's 2022 score of 81 is consistent with his 2010 score of 74. ROA.3508-09.

### b.   Unknown test (2001)

The record reflects that an unidentified test administered by an unknown individual in uncertain testing conditions rendered an IQ score of 96. 36 R.R. 49.[4] The score was considered unreliable by the State at trial and was disregarded. 36 R.R. 64 (noting that there was "probably . . . something wrong with the results"). Because neither the type of test nor the testing conditions—including whether Busby was even the individual who took the test—are known, the score should similarly be disregarded now.

### c.   WAIS-III (2005)

On October 14, 2005, psychologist Dr. Timothy Proctor administered

---

[4] The Reporter's Record of Busby's 2005 capital murder trial is cited herein as [volume number] R.R. [page number].

the WAIS-III to Mr. Busby. 36 R.R 53. He obtained a FSIQ of 77. *Id.* The

WAIS-III was normed in 1995, 10 years before the test was administered. *Id.*

Thus, Busby's score of 77 on the WAIS-III in 2005 is equivalent to his

having scored, rounding up, a 74 (77–3.3 = 73.7), where the mean is 100 after

adjusting for the Flynn Effect. When the Flynn Effect is considered, Busby's

performance on this test was identical to what he obtained on the WAIS-IV

in 2010 and represents significantly sub-average intellectual functioning and

is within the range at which a diagnosis of intellectual disability may be made.

### d.    Beta-III (2005)

On November 4, 2005, days before the trial on the merits began,

psychologist Dr. Timothy Proctor administered the Beta-III to Busby. Dr.

Proctor estimated that, based on this test, Busby's FSIQ was approximately

81. 36 R.R. 53. Despite their similarities, the Weschler Scales and the Beta-

III test differ greatly in their reliability. In Dr. Proctor's words, the Weschler

Scales are the "gold standard of IQ tests," while the Beta-III is a "quick and

dirty kind of intelligence test." 36 R.R. 40, 48. Accordingly, Busby's score

on the Beta-III should not be regarded to be as reliable a score as the IQ score

from the WAIS-IV, or even the WAIS-III.

### e.    WAIS-III (2005)

Just weeks after the Wechsler Adult Intelligence Scales—Third Edition ("WAIS-III") was administered to Busby by psychologist Dr. Timothy Proctor, Busby was tested with the WAIS-III by the State's psychologist, Dr. Sven Helge. 36 R.R. 61. Although never admitted into evidence, it appears from the transcript of the trial that the State's expert, Dr. Helge, obtained a full-scale IQ score of 79. 36 R.R. 77. The WAIS-III was normed in 1995, approximately ten years before Dr. Helge administered the test. Taking the Flynn Effect into account, Busby's WAIS-III score could be considered to be 76. ROA.3511. Moreover, because Dr. Helge administered this test to Busby only weeks after Dr. Proctor administered the same measure, it is appropriate to take the practice effect into account when considering this test. On the Weschler Scales, there is a reported IQ score increase between 2.0 and 3.2 points when individuals are retested at three- and six-month intervals. Michael R. Basso, et al., *Practice Effects on the WAIS-III Across 3-and 6-Month Intervals*, 16 Clinical Neuropsychologist 57, 58 (2002).

When the Flynn and practice effects are taken into account, Busby's

16

score on this test is consistent with both the score he obtained on the WAIS-III administered by Dr. Proctor in 2005 and the score he obtained on the WAIS-IV administered by Dr. Martinez in 2010.

### 2. Evidence of significant limitations in adaptive behavior

Busby also meets the second prong of the definition of intellectual disability: he possesses significant limitations in adaptive behavior. Busby possesses significant limitations in his conceptual, social, and practical skills.

Dr. Gilbert Martinez conducted interviews and standardized tests to assess Busby's adaptive behavior. Dr. Martinez evaluated Busby's conceptual skills (literacy, self-direction, and the concepts of money, numbers, and time), practical skills (personal care, money, occupational skills, maintaining a schedule/routine, use of a telephone, and transportation), and social skills (interpersonal skills, social responsibility, self-esteem, naivety, obeying laws, and following rules). ROA.3507-08.

Dr. Martinez conducted in-depth interviews of Busby's sisters, Kimiko Coleman and Tarsharn Busby, who provided an account of his adaptive behaviors as a child and an adult. ROA.3491-95. During her interview, Tarsharn Busby expressed that Busby had difficulty

17

communicating. ROA.3491. Ms. Busby recalled that Busby did not learn to count or how to perform basic mathematical tasks until the third grade. ROA.3492. She also explained that while he eventually could read the numbers on an analog clock, he failed to comprehend their meaning in relation to time. *Id.* His inability to understand time impacted his ability to maintain a routine or schedule. *Id.*

Ms. Busby expressed that Busby lacked impulse control and the understanding of the consequences of his actions. ROA.3492. Busby was dependent on others to help make decisions for him. *Id.* Ms. Busby remembered that, as a child, Busby did not engage in creative or imaginative play. *Id.* According to Ms. Busby, Busby was an affectionate child but did not like to share. *Id.* As a child, Busby was bullied by other children because he was in special education classes. *Id.* Ms. Busby reported that Busby did not help with chores around at home and had a limited understanding of what needed to be done around the house. ROA.3492.

Ms. Busby recounted that Busby had difficulty managing his finances and making medical appointments. ROA.3493. He did not understand budgeting and would make impulsive and unnecessary purchases if left alone

18

to decide what to do with any money he had. *Id.*

Ms. Busby shared that Busby engaged in concerning behavior when he was younger, such as bringing snakes into the family home and overdosing on medication. *Id.* Ms. Busby recalled that Busby held only one job in his lifetime, as a dishwasher at a steakhouse. *Id.* Although he did tell her why he was fired, she understood that he missed many shifts due to his inability to follow a schedule. *Id.*

Busby's other sister, Kimiko Coleman, provided similar insights into Busby's childhood and adaptive behavior. Ms. Coleman expressed that her brother's communication skills were below average: he slurred his speech and their mother tried to enroll him in speech therapy at his school when he was eight. ROA.3493. Ms. Coleman stated that Busby was in special education classes at school. ROA.3494.

Ms. Coleman said that Busby had "zero" self-control. ROA.3494. He started throwing tantrums from a young age and, throughout his life, his reactions and choices largely depended on his mood. *Id.* Ms. Coleman explained that while Busby could initiate tasks, he was not motivated to, and usually did not, complete them. *Id.* She stated that Busby was unable to sit

19

through an entire movie because of his limited attention span. *Id.* He was prone to quit or cheat during games because he did not understand the rules. *Id.*

Ms. Coleman described Busby as immature for his age and unable to express a normal range of emotions. ROA.3494. Busby tended to emotionally respond in extremes; either very happy or very angry. *Id.* He did not seem interested in others' emotions or in helping others. ROA.3494-95. Ms. Coleman indicated that Busby participated in unhealthy behaviors. At age 10, he stole from a pharmacy. ROA.3495. At age 16, he attempted suicide by overdosing on a medication. *Id.*

Ms. Coleman explained that Busby was dependent on women to take care of him, by having them do tasks such as paying his bills, buying his clothes, making his appointments, cooking, cleaning, and making his travel plans. *Id.*

Dr. Martinez reviewed the affidavits of eight other people who knew Busby across various stages of his life. From these affidavits, Dr. Martinez learned that:

- Busby was often the victim of bullying and manipulation. ROA.3496-97.

- During school, Busby was in prevocational classes for students with IQs between 70 and 82. ROA.3497. These classes taught basic life skills. *Id.*

- Busby could not read, write, or count money. He could not fill out a job application or read Bible verses. He was not able to understand complex instructions and football plays. ROA.3497-98.

- Busby was afraid to be alone. Busby was considered a sad loner who desperately craved the attention and affection of women. Even though Busby always had woman around that he claimed were prostitutes, people who knew him believed he lacked the organizational and accounting skills to be a pimp. Conversely, it was reported that women often manipulated Busby, stealing from him, and taking advantage of his gullibility. ROA.3498-99.

- Multiple people recollected that Busby's hygiene was always lacking. He always wore dirty clothes that were in poor

21

condition. Busby reportedly did not bathe for days and did not maintain proper dental hygiene. ROA.3501.

Busby's sisters each independently completed an ABAS-3 standardized questionnaire, designed to quantify Busby's adaptive functioning. ROA.3502. Busby's scores from the ABAS-3 indicate he is on the extremely low range of adaptive functioning. Tarsharn Busby reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (which summarizes performance across all skills areas): 53, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 58, indicating the extremely low range (lowest 0.3%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

22

ROA.3502-04.

Kimiko Coleman reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (GAC): 52, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 56, indicating the extremely low range (lowest 0.2%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

ROA.3505-07.

### C.    Busby's claim was not available until he received the funds necessary to obtain an expert report.

Busby's application should also be found to make the required prima facie showing that it satisfies the requirement of 28 U.S.C. §

2244(b)(2)(B)(i). Busby did not receive the funds necessary to obtain an expert report until June 4, 2021. His claim was not available until he received those funds from the state court.

### D.     The Court should find that Busby is entitled to equitable tolling.

The state court, at last, granted Busby the funds necessary to obtain an expert report on June 4, 2021, during a subsequent state habeas proceeding initiated by the CCA's authorizing Busby's claim in February 2021. That habeas proceeding concluded when the CCA ultimately denied Busby relief on his claim on March 5, 2025, and then denied Counsel's Suggestion to Reconsider on April 25, 2025. Pursuant to § 2244(d), Busby's claim should have been filed by March 5, 2026.

Counsel urges this Court it is appropriate to find Busby is entitled to equitable tolling for the following reasons: First, because Counsel for the State, joining Counsel for Busby, had asked the trial court to find that Busby was ineligible for death (ROA.3516-37), Counsel had no reason to believe Counsel for the State would ask the trial court to schedule Busby's execution. Once the State asked the trial court to schedule Busby's execution, Counsel determined that a Motion pursuant to Fed. R. Civ. Proc.

24

Rule 60(b), filed in the district court on April 2, 2026, likely constituted Busby's best chance for relief and focused their efforts on that pleading. (As of this date, the appeal of that proceeding remains pending in this Court.) Second, the Court should find Busby is entitled to equitable tolling because every expert who has opined in post-conviction proceedings on whether Buwsby is intellectually disabled has determined he is; for that reason, putting Busby to death would represent the execution of an inmate who is constitutionally ineligible for execution.

## V.    Conclusion

For the reasons set forth above, this Court should authorize Busby to file his proposed petition for writ of habeas corpus in the United States District Court for the Northern District of Texas raising a claim that he is ineligible for execution because he is intellectually disabled.

Respectfully submitted,

/s/ David R. Dow                          /s/ Jeffrey R. Newberry

David R. Dow                              Jeffrey R. Newberry
Texas Bar No. 06064900                    Texas Bar No. 24060966
University of Houston Law Center           University of Houston Law Center
4170 Martin Luther King Blvd.              4170 Martin Luther King Blvd.
Houston, Texas 77204-6060                  Houston, Texas 77204-6060
Tel. (713) 743-2171                        Tel. (713) 743-6843
Fax (832) 842-4671                         Fax (832) 842-4671
Email ddow@central.uh.edu                  Email jrnewber@central.uh.edu

*Counsel for Edward Lee Busby*

## Verification

I, Jeffrey R. Newberry, attorney for Movant in the above-entitled action, state that to the best of my knowledge and belief, the facts set forth in this Motion are true.

I declare under penalty of perjury that the foregoing is true and correct. Executed on Thursday, May 7, 2026.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

27

## Certificates of Service and
## Compliance with ECF Filing Standards

I certify that on May 7, 2026, this Motion was served, via the Court's CM/ECF Document Filing System, upon the following registered CM/ECF users:

Jefferson David Clendenin
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548
jay.clendenin@oag.texas.gov

Counsel further certifies that (1) required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

## Certificate of Compliance with Rule 32(a)

1. This Motion complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 4,764 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2. This Motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this application has been prepared in a proportionally spaced typeface using Microsoft Word for Mac Version 16.108 in 14-point Equity A and 12-point Equity A for footnotes.

/s/ Jeffrey R. Newberry

_____

Jeffrey R. Newberry

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | | |
|---|---|---|
| **EDWARD LEE BUSBY** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| -VS- | § | CIVIL NO. _____ |
| | § | |
| | § | DEATH PENALTY CASE |
| **ERIC GUERRERO**, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| | § | |
| | § | |
| Respondent. | § | |

_____

## PETITION FOR A WRIT OF HABEAS CORPUS

_____

## THIS IS A DEATH PENALTY CASE

David R. Dow
Texas Bar No. 06064900
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
Tel.  (713) 743-2171
Fax (832) 842-4671
Email ddow@central.uh.edu

Jeffrey R. Newberry
Texas Bar No. 24060966
University of Houston Law Center
4170 Martin Luther King Blvd.
Houston, Texas 77204-6060
Tel.  (713) 743-6843
Fax (832) 842-4671
Email jrnewber@central.uh.edu

*Counsel for Edward Lee Busby, Petitioner-Appellant*

## Table of Exhibit

Exhibit 1     Dr. Gilbert Martinez's Report of July 11, 2022

Exhibit 2     Dr. Antionette McGarrahan's Report of April 21, 2023

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **EDWARD LEE BUSBY** | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| -VS- | § | CIVIL NO. _____ |
| | § | |
| | § | DEATH PENALTY CASE |
| **ERIC GUERRERO**, Director, | § | |
| Texas Department of Criminal | § | |
| Justice, Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

_____

## PETITION FOR A WRIT OF HABEAS CORPUS

_____

Petitioner, Edward Lee Busby, is currently confined on death row at the Polunsky Unit in Livingston, Texas. Through undersigned counsel and pursuant to the Constitution of the United States and 28 U.S.C. § 2254, Busby petitions this Court to issue a Writ of Habeas Corpus and grant him relief from his unconstitutional sentence of death.

1

## Jurisdiction

This Court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Busby was convicted in the Criminal District Court Number Two of Tarrant County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## Prior Proceedings

### A.    The homicide and subsequent arrest

On or about January 30, 2004, Busby and a female accomplice, Kathleen Latimer ("Kitty"), abducted seventy-eight-year-old Laura Crane in Fort Worth, Texas, then robbed and murdered her. *Busby v. State*, 253 S.W.3d 661, 663 (2008). Ms. Crane suffocated from having multiple layers of duct tape (approximately 23.1 feet) wrapped tightly over her entire face, covering her nose and mouth. *Id.* at 663-64. Busby was arrested on February 1, 2004, in Oklahoma City when he was stopped for committing traffic violations while driving the victim's car. *Id.*; 30 R.R. 122-123.[1]

Following his arrest, Busby made various statements to the FBI, Oklahoma police, and Fort Worth detectives between February 1 and

---

[1] The Record of Busby's 2005 capital murder trial is cited herein as [volume number] R.R. [page number].

2

February 3. Initially, Busby stated that he and Latimer obtained the victim's car (with Ms. Crane's body already in the trunk) from someone named "JD." *Busby*, 253 S.W.3d at 664. Subsequently, on February 3rd, Busby told the police that he and Latimer were responsible for the Ms. Crane's death. *Id.* On February 20th, Busby again reported that he and Latimer killed the victim. *Id.* In both his tape-recorded statement on February 3rd and his written statement on February 20th, Busby described Latimer "as the leader of their criminal enterprise." *Id.*

## B.    The sentencing case presented at trial

Busby was indicted for the capital murder of Laura Crane in the Criminal District Court Number Two of Tarrant County, Texas, Cause number 0920589A. Busby pleaded not guilty to the indictment, and the trial began on November 9, 2005. 30 R.R. 3-6. On November 11, the jury found Mr. Busby guilty of capital murder. 32 R.R. 75. The punishment phase began on November 14, 2005. 33 R.R. 3.

During the punishment phase, trial counsel presented five lay witnesses and a psychologist during the sentencing phase of Busby's capital murder trial. 35-36 R.R. The first two witnesses were teachers from Pampa,

3

Texas, and had never met Busby. 35 R.R 12-30. They testified about his school records and their content. The third, special education teacher Jeanette Miller, testified that she taught Busby job skills, that he was a follower, and that he once called her to tell her he intended to kill himself. 35 R.R. 33-45.

Busby's two sisters, Kimiko Coleman and Tarsharn Busby testified briefly. Ms. Coleman testified that Busby's father had a different personality when he drank, that he once stole from her, and that she was surprised that he would ever hurt a woman. 35 R.R. 50-66. Ms. Busby testified that Busby's father was an alcoholic, that Ms. Coleman generally cared for them as they were growing up, and that Busby was protective of his sisters. 35 R.R. 71-79.

The final witness presented to the jury by trial counsel, purportedly on Busby's behalf, was Dr. Timothy Proctor, a psychologist. 36 R.R. 6-7. Dr. Proctor testified that Mr. Busby's IQ was approximately 77. *Id.* at 53-54.

However, Dr. Proctor was hired in the middle of individual voir dire. At the time of his meetings with Mr. Busby, the mitigation investigation was still ongoing. As a result, no proper investigation into intellectual disability was conducted, nor were any further mental health professionals, qualified in

4

this area, hired to consult or to testify.

At the conclusion of the punishment hearing, the jury answered the first special issue under article 37.071, Tex. Code Crim. Proc., the "future dangerousness" question[2], affirmatively and answered the second special issue, the "mitigation" issue,[3] negatively. 36 R.R. 157-59. On November 17, 2005, the trial court sentenced Mr. Busby to death. 36 R.R. 161-62.

### C.    Direct appeal and initial state habeas proceeding

Mr. Busby's conviction and sentence were affirmed by the Texas Court of Criminal Appeals ("CCA") on May 14, 2008. *Busby*, 253 S.W.3d at 661. The conviction became final on December 1, 2008, when the United States Supreme Court denied Mr. Busby's petition for writ of certiorari. *Busby v. Texas*, 129 S. Ct. 625 (2008).

Mr. Busby filed an application for writ of habeas corpus in the state

---

[2] The "future dangerousness" question asks the jury to determine "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071 § 2(b)(1).

[3] The "mitigation" issue asks the jury to determine "[w]hether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed." Tex. Code Crim. Proc. art. 37.071 § 2(e)(1).

habeas trial court on March 4, 2008. 2 S.H.R. at 386; Supp. S.H.R. at 2. Mr. Busby's initial application did not include an *Atkins* claim. *See id.* The trial court recommended that relief be denied, and the CCA accepted the recommendation, denying relief on February 25, 2009. *Ex parte Busby*, No. 70,747-01 (Tex. Crim. App. 2009).

### D.    Initial federal habeas proceeding

Mr. Busby timely filed his initial federal petition for writ of habeas corpus on February 25, 2010, and an amended petition on March 24, 2010, alleging seven grounds for relief from his conviction and death sentence. Because the claim was not exhausted, the federal proceeding was stayed to allow Busby to present his *Atkins* (and other) claim to the state court. Mr. Busby filed his subsequent application for writ of habeas corpus, containing an *Atkins* claim, on October 1, 2012. *Ex parte Busby*, No. WR-70,747-02 (Tex. Crim. App. Mar. 6, 2013). The CCA held that the subsequent application did not meet the requirements of Article 11.071, section 5(a) and dismissed the application. *Id.*

After subsequently returning to the federal district court, Busby filed a Second Amended Petition for a Writ of Habeas Corpus on March 27, 2014.

On March 10, 2015, the district court entered its order denying Busby relief. With respect to Busby's *Atkins* claim, the court found that the claim was procedurally defaulted because Busby could not demonstrate it would be a miscarriage of justice to execute him because the Court believed that an individual must have an IQ of 70 or below to be intellectually disabled and the Court furthered believed Busby's actual IQ score to likely be "in the 70s."

On appeal, the Court of Appeals for the Fifth Circuit granted a certificate of appealability, finding that reasonable jurists would debate both whether Busby possesses significantly subaverage intellectual functioning and whether his claim was procedurally defaulted. *Busby v. Davis*, 677 F. App'x 884, 888-89 (5th Cir. 2017). On May 20, 2019, the appellate court issued its opinion affirming the district court's decision denying Busby relief on his *Atkins* claim. *Busby v. Davis*, 925 F.3d 699, 702 (5th Cir. 2019). The Supreme Court denied certiorari on January 13, 2020. *Busby v. Davis*, 589 U.S. 1141 (2020).

**E.    Subsequent state habeas proceeding**

Busby was initially scheduled to be executed in May 2020, but that execution was stayed due to the global pandemic. *In re Busby*, No. WR-70,747-03, 2020 WL 2029306, at *1 (Tex. Crim. App. Apr. 27, 2020). After executions resumed following the pandemic-related pause, Busby was again scheduled to be executed on February 10, 2021. Ahead of that planned execution, Counsel presented Busby's *Atkins* claim to the CCA again, and the Court found that Busby's claim made a threshold showing that he is intellectually disabled pursuant to the Supreme Court's opinion issued in *Moore v. Texas*, 581 U.S. 1 (2017), and remanded the claim to the state habeas trial court for further proceedings.

Following the remand, the state trial court at last granted Busby the funds necessary to obtain an opinion from an expert regarding whether Busby is intellectually disabled (funds Counsel had been seeking since 2009). Counsel utilized those funds -- secured more than twelve years after they were first requested -- to employ Dr. Gilbert Martinez. Dr. Martinez's opinion, announced in his Report of July 11, 2022 is that Busby is intellectually disabled. (Dr. Martinez's Report is included as Exhibit 1 of this Petition.) The State subsequently hired an expert -- Dr. Antoinette

8

McGarrahan -- who agreed with Dr. Martinez's conclusion. (Dr. McGarrahan's Report is included as Exhibit 2 of this Petition.) The State and Busby both asked the trial court to find Busby is ineligible for execution. Nevertheless, the CCA denied Busby habeas relief on March 5, 2025.

## Claim for Relief

**Busby's death sentence runs afoul of the Eighth and Fourteenth Amendments because he is intellectually disabled.**

### A.    The legal standard

The execution of an intellectually disabled person violates the Eighth Amendment's proscription against cruel and unusual punishment. *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).

Because the Texas Legislature has not yet provided a statutory definition of intellectual disability, it is appropriate for this Court to rely on the definitions set out by the American Association of Intellectual and Developmental Disabilities ("AAIDD") and the American Psychiatric Association ("APA") when assessing an *Atkins* claim arising from a Texas death sentence.[4] *See Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017). Intellectual

---

[4] When *Atkins* was decided, the definition of intellectual disability was based on definitions from the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition

disability is characterized by: "significantly subaverage" (APA) or "significant limitations" in (AAIDD) intellectual functioning, accompanied by "significant limitations" in adaptive behavior, the onset of which occurs prior to the age of 18. *See* AAIDD, *Intellectual Disability: Definition, Classification, and Systems of Supports* 7 (11th ed. 2010) ("2010 AAIDD Manual"); APA, *Diagnostic and Statistical Manual of Mental Disorders* 37 (5th ed. 2013) ("DSM-V"); *see also Moore*, 137 S. Ct. at 1045.

Significantly subaverage intellectual functioning is defined by an IQ score that is approximately two standard deviations below the mean, adjusted for the standard error of measurement. 2010 AAIDD Manual at 27; DSM-V at 37. For IQ tests that have a standard deviation of 15 points, such as the Weschler Scales, an IQ score of 70 is two standard deviations below the mean and the standard error of measurement is approximately 5 points. DSM-V at 37. Thus, an IQ score of up to 75 would be included within the range of significant limitations in intellectual functioning. Courts must

---

("DSM-IV") and the AAMR's definition in Mental Retardation: Definition, Classification, and Systems of Supports, 10th Edition ("2002 AAMR Manual"). *Atkins*, 536 U.S. at 309 n.3. Since *Atkins*, the medical community has updated these definitions, as reflected in the DSM-V and 2010 AAIDD Manual. The CCA has adopted the most recent definitions from the DSM-V and 2010 AAIDD Manual in assessing claims of intellectual disability within the capital-sentencing context. *See Brownlow v. State*, No. AP-77,068, 2020 WL 718026, at *11-12 (Tex. Crim. App. Feb. 12, 2020).

account for an IQ test's standard error of measurement and must consider all three prongs holistically when assessing an *Atkins* claim. *Moore v. Texas*, 137 S. Ct. 1039, 1050 (2017). For that reason, the Supreme Court has invalidated statutes that have a strict IQ test score cutoff at 70 points. *Hall v. Florida*, 572 U.S. 701, 718 (2014).

The AAIDD Manual also requires that there be "significant limitations . . . in adaptive behavior as expressed in conceptual, social, and practical skills." 2010 AAIDD Manual at 5. "Significance" can be established if the individual's adaptive skills fall two or more standard deviations below the mean in at least one of the three domains. *Id*. at 43; DSM-V at 38; *see also Moore*, 137 S. Ct. at 1046. The AAIDD Manual provides examples of "representative skills" in each of the three domains:

(1)    Representative **conceptual skills** are "language, reading and writing, money, time, and number concepts." 2010 AAIDD Manual at 44.

(2)    Representative **social skills** are "interpersonal skills, social responsibility, self-esteem, gullibility, naiveté (i.e., wariness), follows rules/obeys laws, avoids being victimized, and social problem solving." *Id*.

(3)    Representative **practical skills** are "activities of daily living (personal care), occupational skills, use of money, safety, health care, travel/transportation, schedules/routines, and use of the telephone."

*Id.*

The APA definition requires that there be "significant limitations" in at least two of the following eleven domains:

(1) communication
(2) self-care
(3) home living
(4) social/interpersonal skills
(5) use of community resources
(6) self-direction
(7) health
(8) safety
(9) functional academics
(10) leisure
(11) work

DSM-V at 33.

The 2010 AAIDD Manual describes four categories of risk factors that may interact to cause mental retardation. The four categories of risk factors are:

(1) biomedical: factors that relate to biologic processes, such as genetic disorders or nutrition;

(2) social: factors that relate to social and family interaction, such as stimulation and adult responsiveness;

(3) behavioral: factors that relate to potentially causal behaviors, such as dangerous (injurious) activities or maternal substance abuse; and

(4)    educational: factors that relate to the availability of educational supports that promote mental development and the development of adaptive skills.

2010 AAIDD Manual at 61. The 2010 AAIDD Manual emphasizes that "the impairment of functioning that is present when an individual meets the criteria for a diagnosis of mental retardation usually reflects the presence of several risk factors that interact over time." *Id.*

Prior to *Moore*, the CCA often considered an applicant's adaptive strengths when assessing *Atkins* claims. *Moore*, 137 S. Ct. at 1050. However, *Moore* established that a court's focus should not be on adaptive strengths, but instead on the individual's adaptive deficits. *Id.* It is now established an individual may possess adaptive strengths in one or more areas but still be limited in their adaptive functioning. *Id.*

### B.    Busby is intellectually disabled.

Busby is intellectually disabled. The evidence shows that he: possesses significantly subaverage intellectual functioning, has significant limitations in his adaptive functioning, and exhibited these diagnostic features before the age of eighteen.

13

### 1. Busby possesses significantly subaverage intellectual functioning.

When assessing an individual's level of intellectual functioning based on an IQ score, the accepted scientific phenomenon known as the "Flynn Effect"—in which the general population's average IQ score is observed to perform better on intelligence tests over time—should be taken into account. *See* 2010 AAIDD Manual at 37. Flynn's empirical research has demonstrated that the average IQ score obtained by any given group on the Wechsler scale has historically increased by approximately 0.33 points per year. *Id.*

In *Ex parte Cathey*, 451 S.W.3d 1 (Tex. Crim. App. 2014), the CCA noted that the preferred solution to account for the Flynn Effect is to retest individuals with a recently normed version of an IQ test rather than adjusting an individual's score for the Flynn Effect. *Ex parte Cathey*, 451 S.W.3d 1, 16 (Tex. Crim. App. 2014). However, if it is not possible to retest an applicant with a recently normed test, the impact of the Flynn Effect on an individual's IQ score can be considered. *Id.* at 17. As more recently normed IQ tests are more reliable, Busby's IQ scores obtained from the WAIS-IV will be discussed first. The IQ scores Mr. Busby received from other IQ tests will be subsequently discussed in chronological order.

14

### a.    WAIS-IV (2010 and 2022)

As noted above, on February 11, 2010, Dr. Gilbert Martinez administered the Wechsler Adult Intelligence Scales—Fourth Edition ("WAIS-IV") to Mr. Busby. Exhibit 1 at 2-3. Busby obtained a full-scale IQ score of 74. Exhibit 1 at 2. Given the standard error of measurement, this means Busby's IQ was between 70 and 79. *Id.*

As part of the 2010 administration, Dr. Martinez administered validity testing—specifically, a standardized measure called the Test of memory malingering ("TOMM")—to determine whether Busby was performing to the best of his abilities. Exhibit 1 at 2. The results of the validity testing were "consistent with good effort" on Busby's part, meaning there is no reason to believe Busby malingered during the cognitive testing. *Id.*

On February 25, 2022, Dr. Martinez again administered the WAIS-IV to Busby. Exhibit 1 at 7. Busby obtained a full-scale IQ score of 81. *Id.* The report notes the seven-point increase was likely caused by both the Flynn Effect and the practice effect. Exhibit 1 at 25-26. Because the WAIS-IV was published in 2008 (fourteen years before the 2022 administration), Dr. Martinez believes that, to account for the Flynn Effect, Busby's 2022 score

15

should be adjusted by four points. *Id.* Accounting for this adjustment,

Busby's Flynn-adjusted score is 77. *Id.*

Dr. Martinez believes the practice effect also had an impact on

Busby's 2022 score. Exhibit 1 at 25-26. "Practice effects refer to gains in

standardized test scores that result from a person being tested a second time

using the same instrument." Exhibit 1 at 25; *see also* 2010 AAIDD Manual at

38. Despite a lack of universal agreement on quantitative score adjustments,

the practice effect has shown increases of 2.5 points in verbal IQ and up to

eight points in performance IQ. Exhibit 1 at 25.

Dr. Martinez believes that when both the Flynn and practice effects

are taken into account, Busby's 2022 score of 81 is consistent with his 2010

score of 74. Exhibit 1 at 25-26.

### b.    Unknown test (2001)

The record reflects that an unidentified test administered by an

unknown individual in uncertain testing conditions rendered an IQ score of

96. 36 R.R. 49.[5] The score was considered unreliable by the State at trial and

was disregarded. 36 R.R. 64 (noting that there was "probably . . . something

---

[5] The Reporter's Record of Busby's 2005 capital murder trial is cited herein as [volume number] R.R. [page number].

wrong with the results"). Because neither the type of test nor the testing conditions—including whether Busby was even the individual who took the test—are known, the score should similarly be disregarded now.

### c.    WAIS-III (2005)

On October 14, 2005, psychologist Dr. Timothy Proctor administered the WAIS-III to Mr. Busby. 36 R.R 53. He obtained a FSIQ of 77. *Id.* The WAIS-III was normed in 1995, 10 years before the test was administered. *Id.* Thus, Busby's score of 77 on the WAIS-III in 2005 is equivalent to his having scored, rounding up, a 74 (77–3.3 = 73.7), where the mean is 100 after adjusting for the Flynn Effect. When the Flynn Effect is considered, Busby's performance on this test was identical to what he obtained on the WAIS-IV in 2010 and represents significantly sub-average intellectual functioning and is within the range at which a diagnosis of intellectual disability may be made.

### d.    Beta-III (2005)

On November 4, 2005, days before the trial on the merits began, psychologist Dr. Timothy Proctor administered the Beta-III to Busby. Dr. Proctor estimated that, based on this test, Busby's FSIQ was approximately 81. 36 R.R. 53. Despite their similarities, the Weschler Scales and the Beta-

17

III test differ greatly in their reliability. In Dr. Proctor's words, the Weschler Scales are the "gold standard of IQ tests," while the Beta-III is a "quick and dirty kind of intelligence test." 36 R.R. 40, 48. Accordingly, Busby's score on the Beta-III should not be regarded to be as reliable a score as the IQ score from the WAIS-IV, or even the WAIS-III.

### e.    WAIS-III (2005)

Just weeks after the Wechsler Adult Intelligence Scales—Third Edition ("WAIS-III") was administered to Busby by psychologist Dr. Timothy Proctor, Busby was tested with the WAIS-III by the State's psychologist, Dr. Sven Helge. 36 R.R. 61. Although never admitted into evidence, it appears from the transcript of the trial that the State's expert, Dr. Helge, obtained a full-scale IQ score of 79. 36 R.R. 77. The WAIS-III was normed in 1995, approximately ten years before Dr. Helge administered the test. Taking the Flynn Effect into account, Busby's WAIS-III score could be considered to be 76. Exhibit 2 at 3. Moreover, because Dr. Helge administered this test to Busby only weeks after Dr. Proctor administered the same measure, it is appropriate to take the practice effect into account when considering this test. On the Weschler Scales, there is a reported IQ

18

score increase between 2.0 and 3.2 points when individuals are retested at three- and six-month intervals. Michael R. Basso, et al., *Practice Effects on the WAIS-III Across 3-and 6-Month Intervals*, 16 Clinical Neuropsychologist 57, 58 (2002).

When the Flynn and practice effects are taken into account, Busby's score on this test is consistent with both the score he obtained on the WAIS-III administered by Dr. Proctor in 2005 and the score he obtained on the WAIS-IV administered by Dr. Martinez in 2010.

### 2. Evidence of significant limitations in adaptive behavior

Busby also meets the second prong of the definition of intellectual disability: he possesses significant limitations in adaptive behavior. Busby possesses significant limitations in his conceptual, social, and practical skills.

Dr. Gilbert Martinez conducted interviews and standardized tests to assess Busby's adaptive behavior. Dr. Martinez evaluated Busby's conceptual skills (literacy, self-direction, and the concepts of money, numbers, and time), practical skills (personal care, money, occupational skills, maintaining a schedule/routine, use of a telephone, and

19

transportation), and social skills (interpersonal skills, social responsibility, self-esteem, naivety, obeying laws, and following rules). Exhibit 1 at 24-25.

Dr. Martinez conducted in-depth interviews of Busby's sisters, Kimiko Coleman and Tarsharn Busby, who provided an account of his adaptive behaviors as a child and an adult. Exhibit 1 at 8-12. During her interview, Tarsharn Busby expressed that Busby had difficulty communicating. Exhibit 1 at 8. Ms. Busby recalled that Busby did not learn to count or how to perform basic mathematical tasks until the third grade. Exhibit 1 at 9. She also explained that while he eventually could read the numbers on an analog clock, he failed to comprehend their meaning in relation to time. *Id.* His inability to understand time impacted his ability to maintain a routine or schedule. *Id.*

Ms. Busby expressed that Busby lacked impulse control and the understanding of the consequences of his actions. Exhibit 1 at 9. Busby was dependent on others to help make decisions for him. *Id.* Ms. Busby remembered that, as a child, Busby did not engage in creative or imaginative play. Exhibit 1 at 9. According to Ms. Busby, Busby was an affectionate child but did not like to share. *Id.* As a child, Busby was bullied by other children

20

because he was in special education classes. *Id.* Ms. Busby reported that Busby did not help with chores around at home and had a limited understanding of what needed to be done around the house. Exhibit 1 at 9.

Ms. Busby recounted that Busby had difficulty managing his finances and making medical appointments. Exhibit 1 at 10. He did not understand budgeting and would make impulsive and unnecessary purchases if left alone to decide what to do with any money he had. *Id.*

Ms. Busby shared that Busby engaged in concerning behavior when he was younger, such as bringing snakes into the family home and overdosing on medication. Exhibit 1 at 10. Ms. Busby recalled that Busby held only one job in his lifetime, as a dishwasher at a steakhouse. *Id.* Although he did tell her why he was fired, she understood that he missed many shifts due to his inability to follow a schedule. *Id.*

Busby's other sister, Kimiko Coleman, provided similar insights into Busby's childhood and adaptive behavior. Ms. Coleman expressed that her brother's communication skills were below average: he slurred his speech and their mother tried to enroll him in speech therapy at his school when he

was eight. Exhibit 1 at 10. Ms. Coleman stated that Busby was in special education classes at school. Exhibit 1 at 11.

Ms. Coleman said that Busby had "zero" self-control. Exhibit 1 at 11. He started throwing tantrums from a young age and, throughout his life, his reactions and choices largely depended on his mood. *Id.* Ms. Coleman explained that while Busby could initiate tasks, he was not motivated to, and usually did not, complete them. Exhibit 1 at 11. She stated that Busby was unable to sit through an entire movie because of his limited attention span. *Id.* He was prone to quit or cheat during games because he did not understand the rules. *Id.*

Ms. Coleman described Busby as immature for his age and unable to express a normal range of emotions. Exhibit 1 at 11. Busby tended to emotionally respond in extremes; either very happy or very angry. *Id.* He did not seem interested in others' emotions or in helping others. Exhibit 1 at 11-12. Ms. Coleman indicated that Busby participated in unhealthy behaviors. At age 10, he stole from a pharmacy. Exhibit 1 at 12. At age 16, he attempted suicide by overdosing on a medication. *Id.*

Ms. Coleman explained that Busby was dependent on women to take care of him, by having them do tasks such as paying his bills, buying his clothes, making his appointments, cooking, cleaning, and making his travel plans. Exhibit 1 at 12.

Dr. Martinez reviewed the affidavits of eight other people who knew Busby across various stages of his life. From these affidavits, Dr. Martinez learned that:

- Busby was often the victim of bullying and manipulation. Exhibit 1 at 13-14.

- During school, Busby was in prevocational classes for students with IQs between 70 and 82. Exhibit 1 at 14. These classes taught basic life skills. *Id.*

- Busby could not read, write, or count money. He could not fill out a job application or read Bible verses. He was not able to understand complex instructions and football plays. Exhibit 1 at 14-15.

- Busby was afraid to be alone. Busby was considered a sad loner who desperately craved the attention and affection of women.

Even though Busby always had woman around that he claimed were prostitutes, people who knew him believed he lacked the organizational and accounting skills to be a pimp. Conversely, it was reported that women often manipulated Busby, stealing from him, and taking advantage of his gullibility. Exhibit 1 at 15-16.

- Multiple people recollected that Busby's hygiene was always lacking. He always wore dirty clothes that were in poor condition. Busby reportedly did not bathe for days and did not maintain proper dental hygiene. Exhibit 1 at 18.

Busby's sisters each independently completed an ABAS-3 standardized questionnaire, designed to quantify Busby's adaptive functioning. Exhibit 1 at 19. Busby's scores from the ABAS-3 indicate he is on the extremely low range of adaptive functioning. Tarsharn Busby reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (which summarizes performance across all skills areas): 53, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

24

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 58, indicating the extremely low range (lowest 0.3%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

Exhibit 1 at 19-21.

Kimiko Coleman reported the following scores for Busby's adaptive domains:

- General Adaptive Composite (GAC): 52, indicating Busby is in the extremely low range (lowest 0.1%) of overall adaptive functioning.

- Conceptual: 54, indicating the extremely low range (lowest 0.1%) of adaptive skills in communication, self-direction, and functional academics.

- Social: 56, indicating the extremely low range (lowest 0.2%) of leisure and social skills.

- Practical: 54, indicating the extremely low range (lowest 0.1%) of adaptive performance in community use, home living, health and safety, self-care, and work.

Exhibit 1 at 22-24.

### Prayer for Relief

WHEREFORE, Petitioner Edward Lee Busby prays that this Court:

1.    Issue a writ of habeas corpus that he may be brought before it and relieved of his unconstitutional sentence of death.

2.    Grant such other relief as law and justice require.


Respectfully submitted,

/s/ David R. Dow                          /s/ Jeffrey R. Newberry

_____         _____
David R. Dow                               Jeffrey R. Newberry
Texas Bar No. 06064900            Texas Bar No. 24060966
University of Houston Law Center    University of Houston Law Center
4170 Martin Luther King Blvd.      4170 Martin Luther King Blvd.
Houston, Texas 77204-6060         Houston, Texas 77204-6060
Tel. (713) 743-2171                    Tel. (713) 743-6843
Fax (832) 842-4671                     Fax (832) 842-4671
Email ddow@central.uh.edu         Email jrnewber@central.uh.edu

26

**Verification**

I, Jeffrey R. Newberry, attorney for Petitioner in the above-entitled action state that to the best of my knowledge and belief, the facts set forth in this Third Amended Petition are true. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 7, 2026.

/s/ Jeffrey R. Newberry

Jeffrey R. Newberry

**Certificate of Service**

On Thursday, May 7, 2025, I electronically filed the forgoing pleading with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. A Notice of Electronic Filing was sent to Mr. Jefferson D. Clendenin, attorney of record for Respondent Guerrero, at his email address: jay.clendenin@oag.texas.gov.

/s/ Jeffrey R. Newberry

Jeffrey R. Newberry

1